COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
NO. 2-01-276-CV
 
ADRIANA CANO, M.D.           
           
           
           
           
           
      APPELLANT
V.
NORTH TEXAS NEPHROLOGY ASSOCIATES, P.A.       
           
           
         
APPELLEE
------------
FROM THE 67
TH DISTRICT COURT OF TARRANT
COUNTY
------------
OPINION
------------
I. Introduction
Appellant Adriana Cano, M.D. brought suit
against her former employer, appellee North Texas Nephrology Associates ("NTNA"),
for breach of contract, fraudulent inducement, and for a declaratory judgment.
Appellant moved for a partial summary judgment on the liability portion of her
breach of contract claim, which the trial court denied. The case was tried
before a jury, and at the close of appellant's case-in-chief, NTNA moved for a
directed verdict on appellant's fraudulent inducement claim, which was granted
by the trial court. The jury returned a verdict in favor of NTNA on the breach
of contract claim, and the trial court rendered a judgment that appellant take
nothing on her claims and awarded attorney's fees to NTNA. In five issues,
appellant complains that: (1) the trial court erred in denying her motion for
summary judgment; (2) the trial court erred in granting NTNA's directed verdict
on her fraudulent inducement claim; (3) the trial court erred when it excluded
from evidence the contract of a subsequent employee of NTNA; (4) the jury's
verdict was not supported by legally or factually sufficient evidence; and (5)
the trial court erred when it awarded attorney's fees to NTNA. We affirm the
trial court's judgment.
II. Background
Appellant was raised in Mexico but
attended college in the United States. After college, appellant attended medical
school at the University of Texas Southwestern Medical School. She completed a
residency in nephrology, a medical specialty concerning the kidneys, and
remained at the medical school for an additional four years for a nephrology
fellowship. After her fellowship, she stayed at the school for another four
years as an assistant professor.
In late 1996, appellant sought employment
as a private practitioner. NTNA contacted her and negotiated with her concerning
potential employment through its sole shareholder, Dr. Victor Meltzer ("Dr.
Meltzer"). Appellant testified that Dr. Meltzer told her she would be
eligible to be a "partner" after her first two years of employment and
that a second doctor at NTNA was a partner.
Appellant eventually accepted a position
with NTNA. NTNA drafted an employment agreement that provided she would receive
an annual base salary of $150,000 and possible discretionary bonuses from time
to time. The agreement also stated that, appellant would be eligible for
"productivity compensation" every six months. Paragraph 3.02 of the
employment agreement sets forth a formula for determining the amount of her
productivity compensation using the "adjusted net profit" appellant
generated. The agreement defined "adjusted net profit" as "the
amount received in cash by [NTNA] during the relevant time period for
services rendered by [appellant]." [Emphasis added.] Both parties
signed this agreement in February 1997.
Appellant began working for NTNA on July
14, 1997. Along with performing billable services at hospitals and at the
offices of NTNA, Cano also performed services at an outpatient clinic for
chronic dialysis patients. These patients would come to the clinic three times
per week on either Monday, Wednesday, and Friday or Tuesday, Thursday, and
Saturday, at various times during the day. NTNA received a capitation fee from
Medicare, Medicaid, and various insurers for the outpatient dialysis services
performed at the clinic. The capitation fee was a fixed, flat amount paid for
each patient for every day that the patient was not in the hospital, regardless
of whether the patient went to the clinic or not. This fee covered the kidney
dialysis procedure and a number of other services that could be rendered during
dialysis.
Appellant later learned that NTNA, as a
matter of policy, did not include the capitation fees paid for non-billable
dialysis services when calculating the amount of productivity compensation unless
the physician providing the service was the actual physician of record for the
dialysis patient. In other words, even though Cano might be the attending NTNA
physician at the dialysis clinic, if she was not the actual physician of record
for a patient, that patient's capitation fee would not be included in Cano's
productivity compensation calculation. After several attempts to acquire more
information and to discuss the misunderstanding, appellant tendered her notice
of resignation on May 1, 1998, effective June 30, 1998.
III. Discussion
Breach of Contract
In her first issue, appellant complains
that the trial court erred when it denied her motion for summary judgment on the
liability portion of her breach of contract claim. An order overruling or
denying a motion for summary judgment is not a proper subject for appeal. Cincinnati
Life Ins. Co. v. Cates, 927 S.W.2d 623, 625 (Tex. 1996). We overrule
appellant's first issue.
In her fourth issue, appellant complains
that the jury's verdict finding that the parties had not agreed the
bonuses would include fees generated at the outpatient dialysis clinic is not
supported by legally or factually sufficient evidence. The trial court submitted
the following question to the jury:

        
 Did [appellant] and [NTNA] agree that [appellant] would be paid productivity
 compensation by [NTNA] based upon the cash received by [NTNA] for all of
 services rendered by [appellant], including fixed flat fee payments
 (capitations payments) for outpatient dialysis patients where cash received
 for such patients is attributable to patients for which [appellant] was not
 the physician of record but for which services were rendered by [appellant]?

The jury answered "No" to this
question.
When the party with the burden of proof
challenges the legal sufficiency of the evidence to support an unfavorably
answered jury question, it is a claim that the contrary proposition was
established as a "matter of law." Gooch v. Am. Sling Co., 902
S.W.2d 181, 183-84 (Tex. App.--Fort Worth 1995, no writ). To prevail on this
issue, Cano must overcome two hurdles. See Victoria Bank & Trust Co. v.
Brady, 811 S.W.2d 931, 940 (Tex. 1991). First, the record must be examined
for evidence that supports the finding, while ignoring all evidence to the
contrary. Second, if there is no evidence to support the finding, then the
entire record must be examined to see if the contrary proposition is established
as a matter of law. Id.; Sterner v. Marathon Oil Co., 767
S.W.2d 686, 690 (Tex. 1989).
When a party with the burden of proof
asserts that the evidence is factually insufficient to support an adverse answer
to a jury question, it is an assertion that the answer was "against the
great weight and preponderance" of the evidence. Gooch, 902 S.W.2d
at 184. In reviewing an issue asserting that an answer is "against the
great weight and preponderance" of the evidence, we must consider and weigh
all of the evidence, both the evidence that tends to prove the existence of a
vital fact as well as evidence that tends to disprove its existence. Ames v.
Ames, 776 S.W.2d 154, 158-59 (Tex. 1989), cert. denied, 494 U.S.
1080 (1990); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). So
considering the evidence, if a finding is so contrary to the great weight and
preponderance of the evidence as to be manifestly unjust, the issue should be
sustained, regardless of whether there is some evidence to support it. Watson
v. Prewitt, 159 Tex. 305, 320 S.W.2d 815, 816 (1959); In re King's
Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).
Appellant contends that the employment
contract was clear and unambiguous and may be interpreted as a matter of law. See
Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983) (stating interpretation of
a written contract is a matter of law if the contract is clear and unambiguous).
Appellant's briefing attempts to focus on the question of whether the work
appellant performed at the dialysis clinic was for "services rendered"
within the meaning of her employment agreement. This position ignores the
central issue in this case: whether any capitation fees paid to NTNA for the
relevant time period can be characterized as "cash received" for any
"service rendered" by appellant.
When a court concludes that contract
language can be given a certain or definite meaning, then the language is not
ambiguous, and the court is obligated to interpret the contract as a matter of
law. DeWitt County Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex.
1999); Coker, 650 S.W.2d at 393. A contract is not ambiguous merely
because parties to an agreement have different interpretations of a term or
phrase. DeWitt, 1 S.W.3d at 100; Forbau v. Aetna Life Ins. Co.,
876 S.W.2d 132, 134 (Tex. 1994) (op. on reh'g). A contract is ambiguous only if,
after the application of established rules of construction, an agreement is
still susceptible to more than one reasonable meaning. Dewitt, 1 S.W.3d
at 100; Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940
S.W.2d 587, 589 (Tex. 1996).
If the meaning of language used in a
written agreement becomes uncertain when applied to the subject matter of the
contract, the contract is latently ambiguous. Birmingham Fire Ins. Co. v.
Am. Nat'l Fire Ins. Co., 947 S.W.2d 592, 603 (Tex. App.--Texarkana 1997,
writ denied); see Nat'l Union Fire Ins. Co. v. CBI Indus., Inc., 907
S.W.2d 517, 520 (Tex. 1995) (op. on reh'g). Although the determination of
whether a contract is ambiguous should be limited to an examination of the
language of the agreement, courts may examine extrinsic evidence of
"surrounding circumstances" or "the subject matter of the
contract" to determine if a latent ambiguity exists. Birmingham,
947 S.W.2d at 603.
There is no ambiguity on the face of the
contract at issue in this case. Attempting to fit the capitation fees paid to
NTNA for outpatient dialysis services to the definition of "adjusted net
profit," however, creates a latent ambiguity in the contract. On the one
hand, it is certainly a reasonable interpretation to say that the capitation
fees are undoubtedly "cash received" and that the work appellant
performed while she attended to the dialysis patients at the clinic was for
"services rendered." On the other hand, it is also reasonable to
interpret the contract to exclude the capitation fees from the term "cash
received for services rendered" because it is difficult to attribute the
fee to any particular service performed. As we have noted above, the capitation
fees are fixed amounts paid to NTNA for each patient for every day the patient
is not in a hospital. Because the patients only receive treatment three
times per week, the capitation fee is even paid for days for which no
service is performed at all. Further, being a fixed amount, the fee does
not vary even if extensive procedures other than mere dialysis are performed.
Because it is difficult to attribute the fees to any particular service, it
would be reasonable to conclude that the capitation fees are not "cash
received" for any specific "service rendered." It is also
reasonable to conclude that Cano was compensated for the services she provided
at the clinic in her base salary.
Because both of these interpretations are
reasonable, we conclude that the contract in this case is ambiguous. As a
result, it was proper for the jury to resolve the fact issue of the parties'
intent regarding the interpretation of this contract. See, e.g., Reilly v.
Rangers Mgmt., Inc., 727 S.W.2d 527, 529 (Tex. 1987). Now we consider
whether the jury's answer is supported by sufficient evidence.
We believe there is ample evidence in the
record supporting the jury's rejection of appellant's proposed interpretation of
the contract. First, the jury heard substantial testimony concerning the nature
of the capitation fees and could have reasoned that capitation fees cannot be
attributed to any particular service rendered.
The fee is paid regardless of whether the
patient arrives and is a fixed fee regardless of most extra services rendered
there. Second, there was evidence in the record that appellant was aware of the
nature of capitation fees before she entered into the contract with NTNA. The
jury could have inferred that because appellant was aware of the nature of
capitation fees, she would have also been aware of the fact that it would have
been difficult to identify which portions of the fees paid to NTNA would be
specifically attributable to her. There was conflicting evidence of whether Dr.
Meltzer had represented to her that the capitation fees attributable to the
clinic would be included in her productivity compensation calculation. The jury
was also told the agreement was drafted by NTNA but that appellant had been
represented during negotiations on the contract and had even successfully
negotiated some modifications to it. Finally, the jury heard evidence that it
had always been NTNA's policy not to include capitation fees in the formula for
calculating the amount of productivity compensation. We conclude that the
evidence was both legally and factually sufficient to support the jury's
verdict. Accordingly, we overrule appellant's fourth issue.
Admissibility of
Subsequent Employment Contract
In her third issue, appellant contends the
trial court erred when it excluded from evidence an employment contract between
NTNA and another nephrologist, Dr. Porres, which was entered into after
appellant had resigned.(1) The trial court struck
the Porres contract in its order denying appellant's motion for summary
judgment. Appellant then re-offered the Porres contract at trial and the court
excluded it again on NTNA's relevancy objection. The contract between appellant
and NTNA was identical to the Porres contract in all but one aspect. Paragraph
3.02 of the Porres contract defined "adjusted net profit" as
"cash [received] . . . for services rendered by and billed in the name
of Physician." [Emphasis added.] Appellant contends the
addition of the phrase "and billed in the name of" to paragraph 3.02
of the Porres contract was relevant to the issue of NTNA's intent regarding her
contract. Appellant specifically argues that both the Porres contract and her
contract cannot be interpreted in the same manner because they each contain
different language in the productivity compensation clause. Appellant contends
that the Porres contract is relevant to rebut NTNA's interpretation of her
contract. NTNA responds claiming that the additional language in the Porres
contract is a clarification and that both contracts may be construed in the same
manner.
A trial court's ruling in admitting or
excluding evidence is reviewable under an abuse of discretion standard. Nat'l
Liab. & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527-28 (Tex. 2000). An
appellate court must uphold the trial court's evidentiary ruling if there is any
legitimate basis in the record for the ruling. Owens-Corning Fiberglas Corp.
v. Malone, 972 S.W.2d 35, 43 (Tex. 1998). We will not reverse a judgment
due to an erroneous evidentiary ruling unless the error probably caused
rendition of an improper judgment. Tex. R. App. P. 44.1, Beam v. A.H.
Chaney, Inc., 56 S.W.3d 920, 924 (Tex. App.--Fort Worth 2001, pet. denied).
In Texas, the general rule is that a
party's prior transactions with other parties are irrelevant and violate the
rule that res inter alios(2) are
incompetent evidence. Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,
886 S.W.2d 294, 299 (Tex. App.--Houston [1st Dist.] 1994), rev'd
on other grounds, 940 S.W.2d 587 (Tex. 1996). Only when the intent with
which an act is done is material may other similar acts of that party be
admissible, "provided they are so connected with the transaction under
consideration in point of time that they may all be regarded as part of a
system, scheme or plan." Id. at 299-300; see also Tex. R.
Evid. 401, 402, 403, 404, 406; Oakwood Mobile Homes, Inc. v. Cabler, 73
S.W.3d 363, 375 (Tex. App.--El Paso 2002, pet. denied) (discussing doctrine of res
inter alios and rules of evidence on habit).
Here the Porres contract was signed about
four months after appellant resigned. It was not signed
contemporaneously with or close in time to the Cano contract sufficient to make
it part of a system, scheme, or plan. Likewise, it was signed after
appellant had asserted claims against NTNA on her contract regarding this very
clause. Appellant offered no evidence showing employment contracts and
compensation formulas for Dr. Meltzer and Dr. Jameson.
At most the Porres contract might have
shown that NTNA acknowledged its previous contract was ambiguous. Because we
have concluded, however, that the contract was ambiguous, we cannot say that the
Porres contract was relevant to any issue. Thus, we hold the trial court did not
abuse its discretion in excluding the Porres contract, and overrule appellant's
third issue.
Directed Verdict on
Fraudulent Inducement Claim
In appellant's second issue, she claims
the trial court erred in granting NTNA's motion for directed verdict on her
fraudulent inducement claim. At the conclusion of appellant's case in chief,
NTNA moved for a directed verdict on all of appellant's causes of action. NTNA
contended their was no evidence of the "intent" element to support her
fraudulent inducement claim. Appellant contends the directed verdict was
improper because there were fact issues surrounding her fraudulent inducement
claim. A directed verdict is proper only under limited circumstances: (1) the
evidence conclusively establishes the right of the movant to judgment or negates
the right of the opponent; or (2) the evidence is insufficient to raise a fact
issue that must be established before the opponent is entitled to judgment. Prudential
Ins. Co. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000); Boswell
v. Farm & Home Sav. Ass'n, 894 S.W.2d 761, 768 (Tex. App.--Fort Worth
1994, writ denied); see also TEX.
R. CIV. P. 268.
In reviewing a directed verdict, we must
view the evidence in the light most favorable to the party against whom the
verdict was rendered and disregard all contrary evidence and inferences. Szczepanik
v. First S. Trust Co., 883 S.W.2d 648, 649 (Tex. 1994); White v. S.W.
Bell Tel. Co., 651 S.W.2d 260, 262 (Tex. 1983). Further, we must determine
if there is any conflicting evidence of probative value that raises a material
fact issue. White, 651 S.W.2d at 262. If there is any such evidence on
any theory of recovery, a determination of that issue is for the jury. Szczepanik,
883 S.W.2d at 649. We must affirm a directed verdict, even though the trial
court's rationale was erroneous, if the directed verdict can be supported on
another basis. Hycarbex, Inc. v. Anglo-Suisse, Inc., 927 S.W.2d 103,
108 (Tex. App.--Houston [14th Dist.] 1996, no writ).
To establish fraudulent inducement, a
plaintiff must show a "material misrepresentation, which was false, and
which was either known to be false when made or was asserted without knowledge
of its truth, which was intended to be acted upon, which was relied upon, and
which caused injury." Formosa Plastics Corp. USA v. Presidio Eng'rs
& Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998).
Appellant identifies several bases for her
fraudulent inducement claim, including misrepresentations made as to the
calculation of and ability to receive a productivity bonus, the opportunity for
obtaining shareholder or partner status, the ability to obtain reimbursement of
insurance expenses, the ability to participate in NTNA's 401(k), and statements
regarding the vacation policy.(3) She also states
that the sole basis for NTNA's directed verdict was lack of evidence of intent
to deceive or defraud.
As to the interpretation of the
productivity clause, appellant admitted in her testimony that there were no
specific discussions regarding which income items were included in the formula.
She complains more of Meltzer's failure to tell her that the services rendered
at the clinic would not be included than that he represented to her they would
be included.
In regard to her partnership status, she
points primarily to the fact that Dr. Jameson, the other NTNA employee, was not
a partner as represented by Dr. Meltzer. Both Dr. Meltzer and Dr. Jameson
testified that they told appellant that partnership or the ability to share in
profits could come after two years of employment. It is unclear whether Dr.
Meltzer denied telling her Dr. Jameson was a partner, but Dr. Meltzer testified
that appellant knew NTNA was a professional association and that there could be
partnership tracks or shareholder tracks. He agrees they both discussed this
issue in some of their many conversations and that it would be considered after
she had been with NTNA for two years. Appellant acknowledges ownership would
have to be something they both agreed upon in the future.
In regard to her reimbursement of
insurance expenses, the testimony showed that while she had not been timely
reimbursed in accordance with their employment agreement, appellant eventually
was reimbursed. As to her ability to participate in NTNA's 401(k), the
employment agreement provided that she could participate in accordance with the
terms and provisions of the plan. Apparently, the plan did not allow employees
to participate until they had been employed for at least one year. Again,
appellant complains that no one told her she could not participate until she had
been there that long. She testified she was told she could participate but that
no one advised her of the eligibility requirements thus; she assumed she could
participate right away.
Additionally, appellant contends she was
denied vacation time she requested, which was allowed by the contract. The
contract provides that the employee would be entitled to fifteen weekdays of
paid vacation per year. The contract specifically states, however, that NTNA
would not be required to pay for or allow vacation in the event of termination
by either party. The latter provision was handwritten into the contract and
initialed by both parties. Further, paragraph 5.03 of the contract, regarding
termination, has the following added language: "Vacation days are not
available upon notice of termination, by either party." Appellant took one
week of vacation in April and upon her return, she asked to take another week.
She testified that Dr. Meltzer refused, but she also acknowledged that timing
and scheduling of vacation was a management function.
While all of these complaints created
obvious tension at NTNA, none of the evidence shows that any material
misrepresentation was ever made to appellant. The contract that she admittedly
signed covered each and every area of concern regarding her employment, except
partnership or shareholder terms, which were the subject of only verbal
discussions according to all the witnesses. To the extent appellant complains
about a misrepresentation of Dr. Jameson's true status, we conclude that the
evidence regarding the designation does not constitute a material
misrepresentation or an indication of intent to deceive. Further, appellant had
not yet been an employee long enough for the alleged partnership or shareholder
verbal terms to begin. Therefore, we hold appellant did not raise a material
fact issue regarding any of her theories. Appellant's second issue is overruled.
Attorney's Fees
In her fifth issue, appellant contends the
trial court erred when it awarded attorney's fees to NTNA. Specifically, she
contends that because NTNA breached the agreement in ways separate from the
failure to pay a productivity bonus, it is not entitled to an award of
attorney's fees. Having concluded that the jury probably resolved the breach of
contract claim against appellant, the jury appropriately awarded attorney's fees
to NTNA under the terms of the contract. Appellant's fifth issue is overruled.
IV. Conclusion
Having overruled each of appellant's
issues, we affirm the trial court's judgment.
 
                                                                       
TERRIE LIVINGSTON
                                                                       
JUSTICE
PANEL B: LIVINGSTON, DAUPHINOT, and
HOLMAN, JJ.
[DELIVERED FEBRUARY 13, 2003]

1. We do not address appellant's challenge to the trial
court's ruling on the inadmissibility of the Porres contract at the summary
judgment hearing for the same reasons set forth in our conclusion regarding
appellant's first issue.
2. "Res inter alios" acts are those acts done
between others or third parties. Black's Law Dictionary 1311 (7th ed.
1999).
3. We note that appellant only pled fraudulent inducement
on the alleged misrepresentation regarding the productivity compensation clause.